# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**NATE A. LINDELL,**
  **Plaintiff,**

 v.             Case No. 19-C-702

**JOHN KIND, JAY VAN LANEN,
and CHRIS HEIL,**
  **Defendants.**

## ORDER

  Plaintiff Nate A. Lindell, a Wisconsin state prisoner representing himself, sued the defendants under 42 U.S.C. § 1983 alleging that they violated his civil rights. The plaintiff is proceeding on claims that the defendants transferred him, and conspired to transfer him, to another institution in retaliation for writing articles about the conditions of confinement in segregation at the Green Bay Correctional Institution and for filing complaints and cases. The parties have filed cross-motions for summary judgment, which I address herein.

### I. BACKGROUND

  On October 9, 2018, the plaintiff was transferred to the Green Bay Correctional Institution ("GBCI") after he was stabbed and seriously injured at the Wisconsin Secure Program Facility. Pl.'s Proposed Findings of Fact ("PPFOF"), ECF No. 51, ¶ 1. The plaintiff was confined at GBCI until February 25, 2019, when he was transferred to the Columbia Correctional Institution ("CCI"). Defs.'s Proposed Findings of Fact ("DPFOF"), ECF No. 44, ¶ 6. This lawsuit challenges the plaintiff's transfer from GBCI to CCI.

The defendants are employed by the Wisconsin Department of Corrections at GBCI. *Id.* ¶¶ 3–5. John Kind is the security director, Jay Van Lanen is a captain in the restrictive housing unit, and Christine Heil is a social worker. *Id.*

## A. Plaintiff's Transfer from GBCI to CCI

Right after the plaintiff arrived at GBCI, Captain Cushing, who is not a defendant, emailed Security Director Kind and Captain Van Lanen about the plaintiff: "This inmate is big into filing litigation. This inmate also writes Between the Bars and they post his writings to a blog on the internet. Anything you say to him or that he is witness to will end up on the internet." PPFOF ¶ 4. The day after the plaintiff arrived at GBCI, Van Lanen told him: "I know you do a lot of litigation." *Id.* ¶ 5.

The plaintiff believed the conditions in GBCI's restrictive housing unit were "profoundly inhumane." *Id.* ¶ 6. He helped other inmates file inmate complaints and lawsuits, and he wrote articles about the conditions for online publication. *Id.* The defendants were aware of the plaintiff's articles and blog posts and emailed each other about them. *Id.* ¶ 7.

According to the plaintiff, Van Lanen subjected him to a harassing strip search and moved him into a feces-smeared cell because the plaintiff complained to psychological staff about how guards were treating a suicidal prisoner. *Id.* ¶ 12. The defendants dispute these allegations and assert that the plaintiff was "placed into controlled separation status to manage his destructive behavior" and because he "had hoarded food and broken containers in his cell found during cell search." Defs.'s Resp. to PPFOF ¶ 12. The plaintiff filed a separate lawsuit on this matter that is currently pending before this court. *See Lindell v. Pollard*, Case No. 19-cv-255-LA.

2

On December 19, 2018, Captain Swiekatowski, who is not a defendant, authored a conduct report against the plaintiff, which Security Director Kind approved, charging the plaintiff with violating prison rules because he had copies of articles posted online and DAI Policy and Procedure 300.00.82 prohibited prisoners from posting material on "social media." PPFOF ¶ 8. Over 300 pages of the plaintiff's articles were seized as contraband. *Id.*

On January 4, 2019, Captain Van Lanen forwarded to Captain Swiekatowski another staff member's email about the plaintiff's recent blog post describing two suicides "in seg." *Id.* ¶ 11.

On January 18, 2019, Social Worker Heil emailed Captain Swiekatowski: "Still posting on social media." *Id.* ¶ 9. The message attached another email that Heil received from a GBCI staff member about the recent blog post. *Id.* Heil visited the plaintiff's blog to see if he was violating any rules. *Id.*

On January 23, 2019, Security Director Kind decided that the plaintiff would serve his full sentence of 240 days in Disciplinary Separation for the conduct report. *Id.* ¶ 13. In the decision, Kind described the plaintiff's misconduct as "poss gang related materials - social media content." *Id.*

According to the defendants, in January 2019, then-deputy warden of CCI Lucas Weber approached Kind about an inmate trade for CCI inmate Jovan Mull, who had previously been held at GBCI. DPFOF ¶¶ 7–8. Whenever an inmate is offered as a possible trade, Kind reviews the inmate's Classification Report, conduct reports, and incident reports. DPFOF ¶ 10. It is common practice to trade maximum-to-maximum institution inmates that have similar institutional needs including behaviors and actions,

placement, and program or treatment needs. *Id.* It is important to try to match, as much as possible, traded inmates to keep a balance between institutions and the climate in restrictive housing. *Id.* ¶ 10.

According to the defendants, Kind offered possible inmates to trade for inmate Mull, including the plaintiff. *Id.* ¶ 9. Kind claims that he wanted inmate Mull because Mull had been "progressing well" at GBCI. PPFOF ¶ 17. Kind stated that the plaintiff was considered for exchange because he was not a self-harmer and could be managed on an alternative unit while CCI's restrictive housing unit was under construction. Defs.'s Resp. to PPFOF ¶ 17. Kind claims that he does not recall which other prisoners were considered alongside the plaintiff for the trade. PPFOF ¶ 18.

Kind was ultimately responsible for deciding which inmates to propose to trade for Mull. DPFOF ¶ 11. Kind and Van Lanen had discussions about the possibility of transferring the plaintiff to CCI instead of transferring another inmate back to CCI, although Kind claims that he "does not recall anything that Van Lanen [sic] specifically stated related to [Lindell]." PPFOF ¶ 25. Kind does not recall Captain Van Lanen making any request to transfer Lindell. DPFOF ¶ 13. Nevertheless, whether Van Lanen made any recommendation or not, Kind was responsible for offering an inmate for trade and reasonably felt CCI could meet Lindell's housing needs. DPFOF ¶¶ 11, 13. According to the defendants, Kind did not take the plaintiff's social media accounts into consideration when he put forth his name as a possible transfer. *Id.* ¶ 16. Kind only considered whether the plaintiff was similar to Mull and whether CCI could meet the plaintiff's housing needs. *Id.*

4

The plaintiff believes he was transferred because he wrote articles, filed complaints and lawsuits, and help other inmates file complaints and lawsuits about GBCI. According to the plaintiff, Security Director Kind sought his transfer two days after a February 5, 2019, Mental Health Multi-Disciplinary Teams Meeting. PPFOF ¶ 33. The minutes from that meeting record a "Reason for Referral" for the plaintiff as "Continues litigation, seeking policy binder" and a "Care Plan" as "HSM to contact CCI." ECF No. 53-1 at 91. That same day, Kind emailed Social Worker Heil: "Could you do up a synopsis on inmate Lindell for CCI. We are looking to possibly do a trade. Inmate Mull has been progressing here and this may work." ECF No. 53-1 at 32. On February 7, 2019, Kind emailed Donna Liebergen and Rebecca Mohnen asking them to complete an early "PRC" on the plaintiff to be transferred to CCI in exchange for inmate Mull. ECF No. 53-1 at 17.

According to the plaintiff, on February 8, 2019, Heil stated that he was going to be transferred out of GBCI because he was "[w]riting internet article and complaints about staff here." PPFOF ¶ 30. According to the defendants, Heil did not attempt to influence Kind to request to transfer the plaintiff. Defs.'s Resp. to PPFOF ¶ 30.

On February 7, 2019, Kind referred the plaintiff for placement at CCI to the Bureau of Classification and Movement Review Committee (BOCM) and requested a Reclassification Review. DPFOF ¶ 18. The plaintiff's Reclassification Hearing was conducted on February 20, 2019. *Id.* ¶ 19. The BOCM reevaluated the plaintiff's custody classification, placement, and program or treatment needs, and adjusted his Reclassification Report based on the plaintiff's time at GBCI. *Id.* ¶ 20. The BOCM also reviewed documents of the plaintiff's offense history, institutional adjustment and conduct,

5

program needs, and program completion. *Id.* ¶ 21. The BOCM unanimously recommended the plaintiff's transfer to CCI on February 22, 2019. *Id.* ¶ 23.

The plaintiff states that the transfer effectively stopped him from helping GBCI prisoners with inmate complaints and lawsuits, as he was no longer able to communicate with them. PPFOF ¶ 38. He also claims he cannot write articles about conditions within GBCI's restrictive housing unit because he is no longer there to see and hear what has occurred. *Id.* The defendants dispute this, stating that the plaintiff admitted he is still able to communicate with inmates in GBCI's restrictive housing unit, and that no restrictions were placed on his ability to communicate with and assist GBCI inmates or describe what occurs in GBCI's restrictive housing unit. Defs.'s Resp. to PPFOF ¶ 38.

**B. Comparing the Plaintiff's Living Situation at GBCI and CCI**

Both GBCI and CCI are maximum-security institutions, have restrictive housing units ("RHU"), and implement a Behavioral Modification Program (Step program) with three different steps or sets of privileges for inmates in restrictive housing status. DPFOF ¶¶ 24–25.

During the plaintiff's time at GBCI (October 9, 2018 to February 25, 2019) he was housed in the RHU on Administrative Confinement status. *Id.* ¶ 26. At GBCI, the plaintiff was in the following steps: Step 1 from October 22, 2018 to December 12, 2018; Step 2 from December 12, 2018 to January 9, 2019; and Step 1 from January 9, 2019 until his transfer to CCI on February 25, 2019. *Id.* ¶ 28. When the plaintiff arrived at CCI, he was placed in the restrictive housing unit at Step 1. *Id.* ¶ 29. He remained in Step 1 from February 25, 2019 to March 15, 2019. *Id.* The plaintiff was housed in the RHU at CCI from February 25, 2019 to July 3, 2019. *Id.* ¶ 30.

While the plaintiff was in RHU at GBCI, he was housed in a single cell equipped with a sink, toilet, light, shower, bunk, mattress, and pillow. *Id.* ¶ 32. While he was in RHU at CCI, he was housed in a single cell equipped with a sink, toilet, light, bunk, mattress, and pillow. *Id.* ¶ 33.

While the plaintiff was in RHU at GBCI, in Steps 1 and 2, he had access to the electronic law library during second shift if time, staff, and unit activities permitted. *Id.* ¶ 34. While the plaintiff was in RHU at CCI, in Steps 1, 2 and 3, he had access to the electronic law library for one sixty-minute period per week. *Id.* ¶ 35. He was allowed one pencil (Step 1) or one pen (Step 2 and 3) and two sheets of paper. *Id.* The plaintiff could lose or forfeit future law library time if he abused it or if he refused to attend his scheduled library time. *Id.*

While the plaintiff was in RHU at GBCI, in Step 1 and 2, he could participate in outside recreation. *Id.* ¶ 36. Recreation was offered at 8:00 a.m. and 1:00 p.m. in two-hour increments, as long as time, weather (no excessive heat, excessive cold or precipitation), and unit activities permitted. *Id.* While he was in RHU at CCI, in Step 1, 2, and 3, he could participate in outdoor exercise four times per week on Sundays, Tuesdays, Wednesdays, and Thursdays, with Friday and Saturday as make-up days. *Id.* ¶ 37. Recreation time was for thirty minutes and one-hour increments as long as time, weather (no excessive heat, excessive cold or precipitation), and unit activities permitted. *Id.*

While the plaintiff was in RHU at GBCI, in Steps 1 and 2, he was allowed visitors over a closed-circuit camera. *Id.* ¶ 38. In Step 1, he was allowed four one-hour visits per month, and in Step 2, the plaintiff was allowed six one-hour visits per month. *Id.* In RHU

7

at CCI, in Steps 1, 2, and 3, the plaintiff was allowed visitors Monday through Friday between 2:00 p.m. and 5:00 p.m. and between 8:00 a.m. and 11:00 a.m. on weekends and holidays. *Id.* ¶ 39. In Step 1, the plaintiff was allowed one visitor per week for up to one hour. In Steps 2 and 3, the plaintiff was allowed one visitor per week for up to two hours. *Id.*

While the plaintiff was in RHU at GBCI, in Step 1, he was allowed one phone call per month for fifteen minutes per call. *Id.* ¶ 40. In Step 2, he was allowed two phone calls per month for fifteen minutes per call. *Id.* In RHU at CCI, in Step 1, the plaintiff was allowed one telephone call per month for twenty minutes. *Id.* ¶ 41. In Step 2, he was allowed two telephone calls per month for twenty minutes. *Id.* In Step 3, he was allowed three telephone calls per month for twenty minutes. *Id.*

While the plaintiff was in RHU at GBCI, he was allowed access to the Health Services Unit and the Psychological Services Unit. *Id.* ¶ 42. In RHU at CCI, he was also allowed access to the Health Services Unit and the Psychological Services Unit. *Id.* ¶ 43.

While the plaintiff was in RHU at GBCI and at CCI, he could mail legal mail, inmate-to-inmate legal mail, and general mail. *Id.* ¶¶ 44–45. If the plaintiff was indigent, he was provided one envelope and two sheets of paper twice a month. *Id.* If he did not have funds to mail legal mail, he could request a legal loan. *Id.*

While the plaintiff was in RHU at GBCI and at CCI, he could file inmate complaints and appeals in a sealed envelope that was routed to a unit officer who then deposited the sealed envelope in the inmate complaint box. *Id.* ¶¶ 46–47.

While the plaintiff was in RHU at GBCI, in Steps 1 and 2, he had access to self-help groups, programs and educational services facilitated by psychologists, social

8

workers, or teachers. *Id.* ¶ 48. In RHU at CCI, in Step 1, 2, and 3, the plaintiff had access to a program called Peer Specialists who are fellow inmates who act as life coaches for inmates. *Id.* ¶ 49. These Peer Specialists supply newspaper articles and puzzles, help with conduct reports, write letters, and work with literacy issues and other inmate concerns. *Id.*

In a different lawsuit where the plaintiff sued for being transferred to GBCI in October 2018, he described GBCI as having "profoundly inhumane conditions" and having "hellish infamy." *Id.* ¶ 50. Transfers of inmates to GBCI from other maximum-security institutions are common, with fifty-eight such transfers occurring since January 1, 2020. *Id.* ¶ 51.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### B. Analysis

The defendants contend that they are entitled to summary judgment on the plaintiff's First Amendment retaliation claim. According to the defendants, the plaintiff's claim fails because he cannot prove that the transfer from GBCI to CCI was a deprivation that would likely deter First Amendment activity in the future and because he was not

9

transferred from GBCI to CCI because of his writings. The defendants contend that they are entitled to summary judgment on the plaintiff's conspiracy claim because none of the defendants deprived him of his constitutional rights.

The plaintiff filed a joint brief opposing the defendants' motion for summary judgment and supporting his motion for partial summary judgment. ECF No. 50. He contends that the defendants' summary judgment arguments sidestep the nature of his claim, which is that the defendants "conspir[ed] to disable Lindell from writing articles, complaints and lawsuits about conditions in GBCI's Seg. unit." ECF No. 50 at 3 (citing Am. Compl. ¶ 20.) The plaintiff contends that this "is not a retaliation claim, but a prior-restraint claim, as clarified in *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)." ECF No. 50 at 4. The plaintiff contends that the defendants killed his speech by transferring him from GBCI to CCI and that his claim is stronger than a "retaliation" claim, particularly given that the defendants failed to provide evidence showing that the transfer was in furtherance of any legitimate prison need. In addition, the plaintiff contends that the defendants were involved in causing the plaintiff's transfer and motivated by a clear desire to stop the plaintiff's protected activity. The plaintiff contends that there is "strong circumstantial evidence that shows that their deterring motive motivated them to push for [his] transfer." ECF No. 50 at 7. In addition, the plaintiff contends that there is direct evidence of retaliation in that Heil admitted that the plaintiff was being transferred due to his complaints and articles. ECF No. 50 at 9.

As an initial matter, based on the plaintiff's contention that the defendants' sidestepped the nature of his claims, I will review the plaintiff's claims in this case. I screened the plaintiff's original complaint and allowed him to proceed "on a claim against

10

defendants Kind and Heil in their individual capacities for having him transferred to another institution in retaliation for plaintiff's article-writing and for filing cases." ECF No. 10 at 5. The plaintiff moved for reconsideration of the court's screening order, arguing that he should have been allowed to proceed on a conspiracy claim. ECF No. 12. I granted the plaintiff's motion and allowed him to proceed on a claim that the defendants conspired to retaliate against him in violation of the First Amendment. ECF No. 13. The plaintiff subsequently filed a motion to amend the complaint to add Captain Van Lanen as a defendant and to add new "information that [he] uncovered from discovery or from [his] own investigation." ECF No. 30. A magistrate judge granted the plaintiff's motion to amend based on his allegations that Captain Van Lanen conspired to retaliate against the plaintiff with Heil and Kind by transferring him to another institution. ECF No. 31. The plaintiff's amended complaint is the operative complaint. ECF No. 32.

The screening order for the amended complaint did not identify a "prior restraint" claim. I have reviewed the amended complaint again and have confirmed the plaintiff does not state such a claim. "Threatening penalties for future speech goes by the name 'prior restraint,' and a prior restraint is the quintessential first-amendment violation." *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). In *Fairley*, the plaintiff-prison guards brought a § 1983 retaliation claim alleging that they were bullied and threatened by other guards to prevent the plaintiffs from testifying in a prisoner's civil rights lawsuit. *Id.* at 524. The defendant guards argued, and the district court agreed, that the plaintiffs did not experience retaliation because the threats preceded the plaintiffs' testimony. *Id.* at 525. In overturning this portion of the district court's decision, the Seventh Circuit explained:

11

> The Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the first amendment. Penalties that follow speech are forbidden. This includes, but certainly is not limited to, reactions to what has already been said. (Of course, the sanction or threat must be serious enough to deter an ordinary person from speaking.) But threats of penalties also are forbidden. That's why it can be misleading to speak of "retaliation" as the basis of a suit. The word implies that threats don't matter, and the district court here was misled.
>
> Threatening penalties for future speech goes by the name "prior restraint," and a prior restraint is the quintessential first-amendment violation. Indeed, for a time it appeared that prior restraints were the only actions forbidden by the first amendment. Later cases have held that penalties for completed speech also violate the Constitution, but this development does not suggest that only post-speech penalties now matter.

*Id.* at 525. (internal citations omitted). The appellate court went on to explain that it is more accurate (and less confusing) to apply the prior restraint label to such claims (as opposed to retaliation). *Id.* Regardless of the term used, *Fairley* clearly provides that the First Amendment protects "speakers from threats of punishment that are designed to discourage future speech." *Id.*

In this case, the plaintiff does not allege that threats of punishment deterred him from his exercise of free speech. Rather, he maintains that he was transferred to CCI because of, or in retaliation for, his complaints and articles. This is not a prior restraint claim but rather a retaliation claim. Even if the plaintiff was proceeding on a prior restraint claim (i.e., a claim that he was threatened to keep him quiet about the conditions at GBCI), he would still have to show that the "conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *See Beatty v. Henshaw*, 826 F. App'x 561, 563–64 (7th Cir. 2020) (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). As explained below, the plaintiff cannot make this showing.

I turn now to the plaintiff's claim that the defendants transferred him to CCI in retaliation for writing articles, filing complaints and lawsuits, and helping other inmates file complaints and lawsuits about GBCI. The plaintiff has the initial burden to establish a prima facie case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff makes this prima facie showing, the defendants must show that the adverse action would have occurred anyway. *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013); *see also Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011) (if inmate meets all three elements, burden shifts to show that officers would have taken the same actions "even in the absence of protected conduct"). If the defendants meet this burden, then the plaintiff must show that the defendants' proffered reason was pretextual—in other words, a lie—and that the real reason was retaliatory animus. *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

The defendants contend that the plaintiff cannot show he suffered a deprivation likely to deter such activity, citing *Holleman v. Zatecky*, 951 F.3d 873 (7th Cir. 2020). In *Holleman*, an inmate alleged that he was transferred from one maximum-security facility to another maximum-security facility because he had filed grievances and made comments to the media about his conditions of confinement. *Id.* at 876. The Seventh Circuit held that the transfer did not amount to an adverse action against the inmate. *Id.* at 880-82. It explained:

> A brief examination of other cases in which a transfer decision was held to be retaliatory demonstrates why Holleman's transfer does not rise to that level. In *Babcock v. White*, we held a transfer decision made with a

13

retaliatory motive could be a violation of the prisoner's First Amendment right even if the transfer decision itself did not independently violate the Constitution. 102 F.3d at 275. However, that case involved a retaliatory decision to delay transferring the plaintiff out of a life-threatening housing situation where he was exposed to members of a group who had sworn to kill him. *Id.* at 268–70. In *Higgason*, the plaintiff alleged he was transferred out of the prison's general population into a segregated housing unit which placed significantly more restrictions on his freedom. 83 F.3d at 808-09. And in *Buise v. Hudkins*, we held a prisoner's transfer from a minimum-security facility to a maximum-security facility could amount to retaliation. 584 F.2d 223, 226, 229–30 (7th Cir. 1978), abrogated in part on other grounds by *Abdul-Wadood v. Duckworth*, 860 F.2d 280, 285 (7th Cir. 1988). These cases all present serious changes of circumstance that would likely deter a person of ordinary firmness from continuing to engage in protected activity.

By contrast, Holleman was transferred from the general population of one maximum-security facility to the general population of another maximum-security facility. The Defendants did not transfer him into, or delay transferring him out of, a life-threatening situation. Holleman alleges no increase in restrictions imposed on him at Wabash Valley, other than minor differences in the policies and conditions of the facilities. The changes in circumstance he does allege—less law library time, being made to share a cell, and having to witness more violence—do not transform the transfer into an adverse action because there is no evidence the Defendants knew the transfer would result in these incidental changed conditions. Regarding increased violence, Holleman alleges only 25 percent of the violence at Wabash Valley is reported. He also provides no evidence of the amount or kind of reported violence at Pendleton for us to be able to compare the two.

…

[P]risoners are subjected to harsher conditions and environments than ordinary citizens. No prison is an ideal home, and it is unlikely to be a home of anyone's choice. *See Giles v. Godinez*, 914 F.3d 1040, 1054 (7th Cir. 2019) ("Prison is, by its very nature, an unpleasant place to be."). The difficulty of living under the strict regimen of a prison includes by definition a loss of choice in one's home. *See Meachum*, 427 U.S. at 224, 96 S.Ct. 2532. Thus, the disruption inherent in a transfer to a different facility does not by itself make the transfer adverse. Without some additional aggravating factor, such as relocation to a much more restrictive or dangerous environment, a transfer is not likely to deter a person of ordinary firmness from continuing to engage in protected conduct.

*Id.* at 881–82.

In this case, like the inmate in *Holleman*, the plaintiff was transferred to CCI where he was confined under circumstances very similar to those under which he was confined at GBCI. The plaintiff does not dispute that the conditions at CCI are similar to those at GBCI. Nor does he attempt to establish that CCI was a more restrictive or dangerous environment than GBCI or that any other aggravating factor made his transfer sufficiently adverse. He has failed to meet his burden of showing that the transfer from GBCI to CCI was likely to deter protected activity. Thus, he cannot establish that his First Amendment right to be free from retaliation was violated. The defendants are entitled to summary judgment on the plaintiff's retaliation claim.

The plaintiff's failure to establish a retaliation claim forecloses his conspiracy claim. To prevail on a conspiracy claim, "the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Put differently, the plaintiff must "show an underlying constitutional violation" and "demonstrate that the defendants agreed to inflict the constitutional harm." *Hurt v. Wise*, 880 F.3d 831, 842 (7th Cir. 2018). Because the plaintiff has failed to establish an underlying constitutional violation, I will grant the defendants' motion for summary judgment on the plaintiff's conspiracy claim.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 42) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiff's motion for partial summary judgment (ECF No. 49) is **DENIED**.

15

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Federal Rules of Appellate Procedure 3 & 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within 28 days of the entry of judgment. Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend either of these deadlines. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 29th day of December, 2021.

s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge
